# TAB A

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PUEBLO OF LAGUNA,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 02-24 L<br>Judge Francis M. Allegra |

**DECLARATION OF DEBRA DIENER**

I, Debra Diener, hereby declare, pursuant to 28 USC § 1746, as follows:

1. I currently am employed by the Department of the Treasury, Financial Management Service (FMS), as Chief Counsel. I have coordinated Treasury's efforts at the development of reasonable steps to comply with the orders of this Court, issued on March 19, 2004.

2. The Department of Treasury herewith submits its status report on the development of "a mechanism for monitoring compliance" with this Court's order of March 19, 2004. Each section of the status report was prepared by employees within the affected bureaus of the Department of the Treasury with personal knowledge of the facts set forth therein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2004.

Debra Diener

DEBRA DIENER

**Status Report on the U.S. Department of the Treasury's Compliance Monitoring Mechanism for The Pueblo of Laguna v. United States**

In an order issued on March 19, 2004, the Court imposed several obligations on the United States. One of these obligations is to establish a mechanism for monitoring the government's compliance with its obligation to preserve documents, data, and tangible things. Another of these obligations is to file a status report with the Court describing that mechanism.

This status report describes (1) the plan that the U.S. Department of the Treasury ("Treasury") has established to satisfy its preservation obligation under the Court's order (the "preservation plan"), and (2) the mechanism that Treasury has established to satisfy its obligation to monitor its compliance with the plan (the "compliance monitoring mechanism"). This report has three parts:

- Because both the preservation plan and the compliance monitoring mechanism necessarily must describe the subject matter of the documents to be preserved, we discuss that topic first.
- The second part of this report describes Treasury's preservation plan.
- The third part of this report describes Treasury's compliance monitoring mechanism, *i.e.*, how Treasury will ensure and demonstrate that these documents are being preserved.

## I. Documents Covered by the Preservation Plan and Compliance Monitoring Mechanism

In Treasury's view, an effective plan for preserving documents and monitoring compliance requires that the documents covered by the plan be described clearly. The Court's order requires the Government to "take reasonable steps to preserve every document, data, or tangible thing in its possession, custody, or control, containing information that is relevant to, or may reasonably lead to discovery of information relevant to, the subject matter of the pending litigation." The boundaries of this broad description are inherently ambiguous, because no party can confidently identify all documents that might be subject to discovery at the outset of a case. At Treasury, there are literally thousands of good people, from clerks to managers, who need more certain guidance in order to apply this order to their daily business operations.

For these reasons, Treasury's report begins by defining more certainly the subject matter of documents, data, and tangible things covered by its preservation plan and compliance monitoring mechanism. This definition is overly broad, and we fully expect that Treasury will need further clarification from the Court as this case proceeds. We put

the definition forward now, however, in order to show our good faith efforts to comply with the Court's order.[1]

To the extent this litigation involves Treasury, its subject matter pertains to Treasury's asserted role as a co-trustee for funds belonging to the Pueblo of Laguna tribe. Our preservation plan and compliance mechanism cover documents pertaining to the activities we have undertaken, and will undertake, in this role:

- *The establishment of accounts in Treasury's central accounting and financial reporting accounting system.* In this regard, Treasury establishes accounts in Treasury's central accounting and financial reporting system for holding tribal trust funds, including funds belonging to the Pueblo of Laguna tribe.

- *The funding of government accounts.* In this regard, based on Interior's reporting, Treasury records the receipt of deposits, the classification (allocation) of those deposits to accounts, and the transfer of appropriated funds to accounts.

- *The investment of amounts in government accounts.* In this regard, at the request of Interior, Treasury invests amounts from the accounts in U.S. Government securities.

- *The redemption of investments in government accounts.* In this regard, at the request of Interior, Treasury redeems investments held in the accounts.

- *Assisting Interior with the disbursement of moneys.* Interior has authority to disburse funds from the accounts through the issuance of Treasury checks. At the direction of Interior, Treasury makes electronic payments and may issue check payments to recipients identified by Interior.

- *The government's accounting activities.* In this regard, Treasury produces account statements and posts account information for deposit-receipt, investment, redemption, and disbursement transactions of the accounts.

---

[1] The document retention order in *Cobell v. Norton* shows the benefit of defining the subject matter of covered documents. In that case, Judge Lamberth required Treasury to retain specific categories of financial records pertaining to the Indian plaintiffs. These categories, while overly broad and sometimes unclear, have been specific enough for Treasury to successfully administer the retention order. An excerpt from the *Cobell* order is attached.

We note that the documents, data, and tangible things described above may pertain to accounts that are specifically in the name of the Pueblo of Laguna tribe, as well as to summary level accounts. Prior to 1973, Treasury maintained in its central accounting and financial reporting system separate accounts for Indian tribes. In 1973, with the concurrence of the U. S. General Accounting Office, these separate accounts (totaling approximately 1,500 at that time) were consolidated on Treasury's books into summary level accounts. Treasury's preservation plan and compliance monitoring mechanism cover existing documents, data, and tangible things created before 1973 and after.

Treasury may also have processed purchases of marketable securities and savings bonds by Interior in trust for the Pueblo of Laguna tribe, and payments relating to Judgment Fund awards. Treasury's preservation plan and compliance mechanism covers any documents, data, and tangible things pertaining to these types of investments and payments that are in our possession, custody, or control.

## II. Treasury's Preservation Plan

### A. Treasury's Current Preservation Plan

Treasury's preservation plan relies in part on a successful structure that we developed to comply with a retention order in the *Cobell* case. Prior to that case, Treasury's practice had been to comply with record retention schedules approved by the National Archives and Record Administration ("NARA"). These schedules permitted Treasury to dispose of records – both trust and non-trust records – at the end of an approved retention period. Treasury ceased this practice for relevant records during *Cobell*, and instituted a rigorous program for protecting them.

The following practices developed during *Cobell* are part of our preservation plan for this case:

- Identifying those records, or systems containing records, that may reflect Treasury's activities as a co-trustee for Indian trust funds. Treasury's Financial Management Service ("FMS") and Bureau of the Public Debt ("BPD") are the Treasury bureaus that have the vast majority of such records for tribal trust funds. Each of these bureaus has created written inventories or narratives describing these records and their locations.

- Providing guidance and reminders, with periodic follow-up, to managers, employees, and relevant third parties about their obligation to preserve and maintain records covered by court orders.

- Maintaining back-up systems or procedures already in place for disaster recovery purposes.

- Suspending the disposal of pertinent records at federal record centers. As part of its normal practice in managing documents, Treasury sends records to NARA for maintenance in federal record centers under approved retention schedules. To preserve documents in *Cobell*, Treasury directed NARA to suspend destruction of documents in certain record groups, and Treasury issues periodic reminders to that effect. Some records relating to tribal funds may be in these record groups. If there are additional record groups that may contain materials covered by our preservation plan, we will issue additional instructions to NARA to preserve these documents.

**B. New Components of Treasury's Preservation Plan**

Treasury has instituted additional practices to ensure compliance with the Court's March 19, 2004 order:

- Following entry of the Court's March 19, 2004 order, FMS, BPD, and Main Treasury's Departmental Offices ("DO") each established a dedicated e-mail archive mailbox to house tribal-related e-mails and a dedicated repository to store voicemail messages related to this case. FMS, BPD, and DO distributed detailed, written instructions for using these storage mechanisms to their respective employees, and directed that they begin using those mechanisms immediately. FMS, BPD, and DO will issue periodic reminders to their employees to continue using these storage mechanisms.

- Following entry of the March 19, 2004 order, FMS, BPD, and DO each issued written directives to pertinent officials concerning the requirements in the Court's order. FMS, BPD, and DO will issue periodic written reminders to their employees.

In sum, Treasury has been, and continues to be, retaining vast categories of documents, data, and tangible things related to Treasury's activities in its role as a co-trustee for Indian tribal trust funds. The above-described preservation plan has proven to be effective and will continue to be employed in a good faith effort to fulfill Treasury's preservation obligations in this case.

**III. <u>Treasury's Compliance Monitoring Mechanism</u>**

**A. Treasury's Current Compliance Monitoring Mechanisms**

Treasury has been employing several mechanisms for monitoring compliance in *Cobell* that will continue in this case. These mechanisms are the following:

- DO, FMS, and BPD have established a clear expectation within their offices that any questions or concerns regarding record retention should be

raised with their legal counsel. These expectations have been set forth in writing and during briefings.

- Senior management at DO, FMS and BPD have been, and continue to be, actively involved in Indian tribal trust fund (and *Cobell*) litigation matters, including record retention. For example, retaining records subject to a court order has been, and continues to be, included as a managerial effectiveness element for annual performance ratings of the Assistant Commissioners at FMS and BPD. Assistant Commissioners are held directly accountable to the Commissioner of their bureau for monitoring and controlling their own office's compliance with retention orders and directives.

- Treasury utilizes orientation briefings, meetings, and periodic reminders to inform employees (including senior Treasury officials and political appointees) about the importance of preserving documents covered by a preservation order, and the importance of promptly reporting any destruction incidents involving such documents. DO employees have been instructed to notify the General Counsel's Office, and FMS and BPD employees have been instructed to notify their Chief Counsel's Office, if such records are destroyed. Treasury will continue to use these mechanisms to keep its employees mindful of these important requirements.

- Upon learning of any destruction incident involving documents, data, or tangible things covered by Treasury's preservation plan, Treasury will promptly report the incident to the Department of Justice. Treasury will subsequently follow up with a written report to the Department of Justice, analyzing the records that were destroyed (such as, whether they contained relevant information and whether the information can be obtained from other records).

**B. New Components of Treasury's Compliance Monitoring Mechanism**

In addition to measures already in place from *Cobell*, Treasury will be taking additional measures to monitor compliance with the Court's order and our preservation plan:

- We will periodically monitor dedicated e-mail and voicemail mailboxes to ensure they have no storage problems.

- We will issue periodic reminders that describe the documents we must preserve to all relevant employees. Copies of these notices will be available for inspection upon request.

- We will ensure that we are keeping necessary electronic information pertaining to the trust functions listed above by querying the systems that retain this information. The ability of these systems to produce necessary data and documents upon request will demonstrate that these systems comply with the Court's order.

# TAB B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JICARILLA APACHE NATION<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 02-25 L<br>Judge Francis M. Allegra |

## DEFENDANT'S SUPPLEMENTAL STATUS REPORT DESCRIBING COMPLIANCE WITH THE MARCH 19, 2004 ORDER

## I. INTRODUCTION

On March 19, 2004, the Court issued a record retention order (RRO) in this case, requiring the parties to take reasonable steps to preserve "documents, data, and tangible things" that contain information relevant to, or that may reasonably lead to information relevant to, the subject matter of this case. As explained in its April 26, 2004 Status Report describing compliance with that Order, the federal agencies that have been identified as having documents potentially subject to the RRO[1/] proceeded to implement reasonable measures to preserve those documents, data and tangible things. The agencies explained to the Court how the RRO had been distributed, the additional instructions

[1/] The RRO does not identify the specific agencies subject to its coverage, instead simply referring generally to the Defendant, (i.e., the United States) along with its "agencies" and "employees." Based on the information provided in the complaint, including references to specific statutes and regulations in Plaintiff's proposed Record Retention Order filed on September 12, 2003, and on the Department of Justice's experience in previous tribal trust cases, the Defendant has focused its attention on the Department of the Interior (DOI), Department of the Treasury (Treasury), the National Archives and Records Administration (NARA), the General Services Administration Indian Trust Accounting Division (ITAD), the Department of Energy (DOE), the Nuclear Regulatory Commission (NRC), and the United States Forest Service (USFS) as the agencies likely to have information subject to the RRO.

for complying with the RRO that had been provided to employees, the additional measures taken in order to comply with the RRO, and the means by which they intended to monitor compliance with the RRO.[2] The focus of the agencies' initial efforts after entry of the RRO was to ensure that their employees were fully informed of their individual obligations under the RRO, particularly the need to save or transcribe voice mails and e-mail.[3]

Since April 26, 2004, the agencies have continued these efforts, focusing on the systematic measures for preserving relevant electronic records. This Supplemental Status Report, along with the attached declarations, updates Defendant's April 26, 2004 Status Report and describes the steps taken by Defendant to continue compliance, particularly in the context of certain electronic media covered by the RRO, including backup data, network and computer activity logs, metadata, web pages, and hard drives.

## II. STATUS

### A. DEPARTMENT OF THE INTERIOR

#### 1. Measures to Ensure the Continued Preservation by Individual Interior Employees of Documents, Data, and Tangible Things

Senior Department of the Interior ("DOI" or "Interior") management has continued to remind

---

[2] *See* April 26, 2004 Status Report, Declaration of Abraham Haspel, Deputy Secretary in the Office of the Secretary, DOI, April 26, 2004 (Haspel Decl.) ¶ 8; Declaration of Cristobal Alvarez, Attorney-Advisor, DOI, April 26, 2004 (Alvarez Decl.) ¶¶ 2-7; Attachment 1 to Declaration of Debra Deiner, April 23, 2004 (Deiner Decl.) ¶¶ 4-6; Declaration of Jason Baron, Director of Litigation in the Office of General Counsel, NARA, April 21, 2004 (Baron Decl.) ¶¶ 3-5; Second Declaration of Dow Davis, Attorney, DOE, April 23, 2004 (Davis Decl.) ¶¶ 8-10; Declaration of Marie Clark, Acting Director (Former), ITAD, April 22, 2004 (Clark Decl.) ¶¶ 4-6, 9-10; and Declaration of James Snow, Special Counsel, DOA, April 22, 2004 (Snow Decl.) ¶ 7; *see also* Declaration of Susan Fonner, Attorney, NRC, April 22, 2004 (Fonner Decl.) ¶¶ 5-10.

[3] Haspel Decl. ¶ 8 and Exhibit D; Alvarez Decl. ¶¶ 3, 4 and Exhibits; Attachment 1 to Deiner Decl. ¶ 4; Baron Decl. ¶ 3.d.; Clark Decl. ¶¶ 7-8; and Fonner Decl. ¶ 6.

# Treasury Excerpt Follows

Superintendents, and Commissioners to ensure that hard drives that are no longer in use but were previously used by employees dealing with Jicarilla and Laguna trust assets are being physically preserved and stored in a safe and secure environment. Memorandum from Lawrence Jensen & W. Hord Tipton to Secretary, *et al.* (October 8, 2004) (Attached as Exhibit 2). The directive also requires that bureaus and offices "label and catalog all preserved hard drives with appropriate documentation to allow for meaningful search and recovery." *Id.*

**B. DEPARTMENT OF THE TREASURY**

This part of the Status Report describes the steps that Treasury is taking to preserve certain electronic media currently used for tribal trust activities. As noted in Treasury's original status report, there are six such activities, and only one of those activities (disbursing) is known to generate electronic records that specifically relate to the Jicarilla Apache Nation. *See* April 26, 2004 Status Report, Attachment 1 to Deiner Decl. at 2. The other activities generate electronic records that relate to undifferentiated funds in Treasury accounts that may belong to many tribes.[11/] Treasury performs transactions with these funds at Interior's direction, and only Interior – as the agency responsible for carrying out the tribal trust fund program – knows the extent to which particular transactions relate to a particular tribe. This fact is critically important when evaluating the reasonableness of Treasury's

---

[11] Prior to July 1, 1973, Treasury maintained separate accounts for tribal trust funds in its central accounting and financial reporting system. On July 1, 1973, with the concurrence of the U.S. General Accounting [now Government Accountability] Office, these separate accounts (totaling approximately 1,500) were consolidated into a few general tribal accounts. *See* April 26, 2004 Status Report, Attachment 1 to Deiner Decl. at 3.

Certain deposits made by specific types of electronic funds transfers may be accompanied by an addendum identifying a particular tribe; however, that information is used (if at all) by the program agency, not Treasury. Although Treasury would likely be able to retrieve that addendum if provided sufficient predicate information to locate a particular electronic funds transfer (just as it can retrieve copies of certain cancelled checks if provided sufficient predicate information), Treasury does not need or use the addendum information in maintaining the general tribal accounts established in 1973.

preservation plan for electronic media.

The following chart shows how the activities that Treasury currently performs for tribal trust funds relate specifically to the Jicarilla Apache Nation.

| **Treasury Trust Activity** | **Relationship to Jicarilla Apache Nation** |
|---|---|
| Establishing Accounts | Treasury does not maintain any accounts specifically for the Jicarilla Apache Nation. Declaration of Richard L. Gregg, Commissioner, FMS, March 4, 2005, (Gregg Decl.) ¶ ¶ 2,3 (Attached as Exhibit 9). Only Interior, as the program agency responsible for carrying out the government's tribal trust fund-related activities, would know the extent to which Jicarilla funds exist in Treasury's general tribal accounts. |
| Funding Tribal Accounts | Treasury keeps electronic records of funds added to general tribal accounts, but (with the exception of certain deposits made through electronic funds transfers), cannot identify which funds may belong to the Jicarilla Apache Nation. *Id.* Only Interior, as the responsible program agency, would be able to do that. |
| Investing Money in Tribal Accounts | Treasury records how it invests funds in general tribal accounts, Declaration of Anne M. Meister, Deputy Commissioner, Bureau of the Public Debt, March 8, 2004 (Meister Decl.) ¶ 2 (Attached as Exhibit 10). Only Interior, as the responsible program agency, would be able to determine the share belonging to the Jicarilla Apache Nation. |
| Redeeming Investments | Treasury records when it redeems investments, but cannot identify what share may belong to the Jicarilla Apache Nation. *Id.* Only Interior, as the responsible program agency, would be able to do that. |

| | |
|---|---|
| Assisting Interior with Disbursing Money to the Jicarilla Apache Nation. | At the direction of Interior, Treasury may disburse money by check or electronic funds transfer to the Jicarilla Apache Nation. Gregg Decl. ¶ ¶ 2, 3. In addition, Interior reports its disbursements to Treasury. *Id.* Treasury retains electronic records of disbursements made by Treasury and Interior, including disbursements to the Jicarilla Apache Nation. *Id.* |
| Accounting Activities | Treasury does accounting for the activities listed above. Gregg Decl. ¶ 2; Meister Decl. ¶ 1. Electronic accounting records are at the general tribal account level, and so do not contain information specific to the Jicarilla Apache Nation. Gregg Decl. ¶ 2; Meister Decl. ¶ 1. |

In the discussion below, Treasury shows how it preserves electronic media and data used in these trust activities. The components performing these activities are the Financial Management Service (FMS), the Bureau of the Public Debt (BPD), and to a very minor degree, Treasury's departmental offices (DO). Tribal trust activities are only a small part of these components' missions. For example, FMS provides centralized disbursement, collection, and accounting services for almost all federal agencies, and oversees the federal government's central accounting and reporting system.[12/] *See* Financial Managment Service, *What We Do at FMS*, (2004), *at* http://www.fms.treas.gov/aboutfms/what.html.

[12] To illustrate the breadth of these activities, FMS oversees the daily cash flow of nearly $58 billion into and out of federal accounts, disburses more than $1.5 trillion annually to more than 100 million individuals via Social Security and veterans' benefits, income tax refunds and other federal payments, and collects more than $2 trillion in federal revenues annually. In fiscal year 2004, nearly 235 million of FMS's payments were disbursed by check. *See* Financial Managment Service, *What We Do at FMS*, (2004), *at* http://fms.treas.gov/aboutfms/what.html.

BPD borrows the money needed to operate the Federal Government and accounts for the resulting debt. *See* Bureau of Public Debt, *The Commssion of the Public Debt Welcomes You*, (2004), at http://www.publicdebt.treas.gov/com/comhello.html. DO is primarily responsible for making policy and managing the entire department. *See* U.S. Department of Treasury, *Departmental Offices*, (2005), *at* http://www.treas.gov/offices/index.html. DO does not perform any of the operations associated with the tribal trust activities listed above. *See id.*

**1. Backup Data.**

Treasury stores tribal trust data in the same systems used for all data central to its mission, and protects it with the same high level of care. Gregg Decl. ¶ 2; Meister Decl. ¶ 2; Declaration of Rory Schultz, Director (Acting) for Headquarters Information Technology, DO, February 28, 2005 (Schultz Decl.) (Attached as Exhibit 11). For example, the system that stores information about Treasury checks issued to tribes, called the Check Payment and Reconciliation System, also stores data about *all* checks issued by the Federal Government since the system was created. Gregg Decl. ¶ 5.A. The system that stores information about tribal investments also stores data about many other government trust funds. Meister Decl. ¶ 2. Safely preserving electronic data in these systems, including tribal trust data, is an essential and integral part of Treasury's mission.

Treasury is currently retaining indefinitely potentially relevant electronic data (*i.e.,* data that documents the six tribal trust activities described in Treasury's original status report filed on April 26, 2004), either in an electronic system's storage device or in archival storage media, such as a magnetic tape or DVD. Gregg Decl. ¶ 5; Meister Decl. ¶ 3. If such data must be removed from an electronic storage device for archival storage, Treasury follows a plan that ensures the data's retention in another media designed for long-term storage. Gregg Decl. ¶ 7; Meister Decl. ¶ 3. As a result, relevant data

may be moved, but it is not lost.

In addition, Treasury protects the operating systems and applications that contain trust data from catastrophic loss through creation of business continuity (a/k/a disaster recovery) backup tapes. Gregg Decl. ¶ ¶ 11, 12; Meister Decl. ¶ 4; Schultz Decl. ¶ 3. Business continuity tapes are designed to permit the wholesale restoration of data to a system in the event of a disaster; such tapes are not designed to be used (or to allow access to data on them) independent of the system that they back up. In other words, the contents of the tapes are generally intelligible and useful only to and in connection with the system being backed up; they are not necessarily intelligible or useful independent of that system. *See* The Sedona Conference, "Best Practice Guidelines & Comments for Managing Information and Records in the Electronic Era" (Sept. 04) at pp. 21, 79 (backup data is distinct from archived data). Because the systems and applications that may contain trust data are constantly in use, and therefore accumulate additional data continually, Treasury creates new backup tapes of the data in active systems at regular intervals and may re-use superseded tapes. (DO does not currently reuse tapes but may decide to do so in the future). Gregg Decl. ¶ 11; Meister Decl. ¶ 4; *see also* Schultz Decl. ¶ 3. Full backup tapes contain all relevant data from previous backup tapes as well as any new data accumulated in the operating system or application being backed up. Gregg Decl. ¶ 11; Meister Decl. ¶ 4; Schultz Decl. ¶ 3.

These procedures ensure that data pertaining to the trust activities above are preserved and protected against inadvertent loss, and meets the Court's requirement that Treasury take reasonable steps to preserve data that may be relevant to the case.[13/]

---

13 Treasury notified Plaintiff of its practices regarding backup data by letter dated August 26, 2004. *See* Letter from Robert W. Rodrigues to Alan Taradash and Thomas Peckham, (continued...)

**2. Metadata**

The Court's March 19 Order calls for Treasury to take reasonable steps to maintain the integrity of "metadata" reasonably anticipated to be subject to discovery in this case. In general, Treasury interprets "metadata" to mean "data about data." In the context of the systems used to perform the trust activities listed above, this term can refer to data that are attached to and travel with other electronic data automatically, so that data can be identified, located, linked, or made accessible. Gregg Decl. ¶ 13; Meister Decl. ¶ 5; Schultz Decl. ¶ 4. Thus defined, Treasury is preserving metadata to the same extent that it is preserving any electronic data that evidences the trust activities mentioned above. Gregg Decl. ¶ 13; Meister Decl. ¶ 5; Schultz Decl. ¶ 4.

**3. Computer and Network Activity Logs**

The Court's March 19 Order calls for Treasury to take reasonable steps to maintain the integrity of "computer and network activity logs" that may reasonably be subject to discovery in this case. At Treasury, these logs are general system logs that contain such information as the time and date that individual users logged into system computers, data related to the use of certain applications, and data related to security incidents. Gregg Decl. ¶ 14; Meister Decl. ¶ 6; Schultz Decl. ¶ 5. Plaintiff has not alleged or otherwise raised any issue in this case that would implicate Treasury's general system logs. Accordingly, Treasury is not taking any additional measures beyond its normal data backup procedures to preserve them. Gregg Decl. ¶ 14; Meister Decl. ¶ 6; Schultz Decl. ¶ 5.

**4. Web Pages**

---

(...continued)
dated August 26, 2004 (Attached as Exhibit 17).

The Court's March 19 Order calls for Treasury to take reasonable steps to maintain the integrity of "Web pages" that may reasonably be subject to discovery in this action. Plaintiff has not sought discovery or information about any issue that implicates Treasury's web pages. Nonetheless, Treasury is taking the following steps to preserve them.

The public websites for FMS and BPD can be found at http://www.fms.treas.gov/ and http://www.publicdebt.treas.gov/, while a list of the divisions that comprise Treasury's Departmental Offices (with appropriate links) can be found at http://www.treas.gov/offices/. The FMS and DO websites are static; that is, each page within the site displays text and other information that has been built into the page itself (such as the departmental seal), or built into documents linked to the page (such as the most recent Daily Treasury Statement, viewable at http://www.fms.treas.gov/dts/index.html. Gregg Decl. ¶ 15; Schultz Decl. ¶ 6. BPD's website is predominantly static, but some pages are not. Meister Decl. ¶ 7. For example, BPD posts the daily rates for state and local government securities, viewable at https://wwws.publicdebt.treas.gov/SZ/SPESDailyRate?requestType=R. This page uses an application that draws correct data from a database, and a program that turns the data into a web page. Meister Decl. ¶ 7. As with most material posted publicly on the Internet, all of these pages are usually available to the public at all times.

Each organization's retention policy concerning its website reflects the nature of the information presented therein. For example, BPD (which hosts the FMS website) provides FMS each month with a copy of FMS's website on CD-rom, which FMS is retaining indefinitely. Gregg Decl. ¶ 15. Additionally, FMS itself makes interim copies of its website and retains those copies for as long as they are needed (after which time they are written over). *Id.* BPD retains a copy of every static HTML webpage, but not copies of the dynamic web pages. Meister Decl. ¶ 7. Instead, BPD retains the

underlying data used to create those dynamic web pages. Meister Decl. ¶ 7. DO backs up all of its Web server data onto tapes and onto its storage area network. Schultz Decl. ¶ ¶ 3, 6.

### 5. Personal Computer Hard Drives

The Court's March 19 Order calls for Treasury to take reasonable steps to maintain the integrity of "hard drives" reasonably anticipated to be subject to discovery. The following describes what Treasury is doing to comply with this part of the Court's order.

FMS's systems that may contain data subject to the RRO are designed to run on mid tier or mainframe systems, and data related to these systems reside on the storage devices for those systems rather than on individual desktop PC hard drives. Gregg Decl. ¶ 6. Such systems at FMS perform centralized payment, collection, and accounting and reporting services for the federal government. Gregg Decl. ¶ 4. Desktop computers can be used only as an access point or gateway to these systems. Gregg Decl. ¶ 6. Accordingly, PC hard drives would not contain any data from these systems that is not already residing within the systems' storage devices.[14]

FMS employees may also access office automation systems through their desktop PCs. Gregg Decl. ¶ 6. Electronic documents created using those systems (such as e-mail, word processing documents, or spreadsheets) are saved to either the PC's hard drive or to a network drive. *Id.* FMS

---

14 Moreover, the data potentially discoverable in this action stored in connection with these systems is preserved in two ways. First, none of that data is ever deleted from those storage devices while they are actively supporting a system. Gregg Decl. ¶ 6. FMS routinely upgrades or replaces these storage devices, but ensures that the data is preserved by moving a complete copy of that data to the new device. *Id.* Second, the data is backed up. *See supra* Section II.B.1., "Backup Data." As a result, it is neither necessary nor sensible for FMS to preserve decommissioned storage devices. It is not necessary because the data has been moved to the newer storage device. Nor is it sensible, because the older equipment will gradually become technologically obsolete. Just as data on 5.25" floppy discs is now virtually inaccessible, data on discarded equipment is destined to become unusable.

has instructed its employees to forward any Jicarilla-related electronic documents that they have used in the course of conducting agency business to the dedicated mailbox set up in response to the Court's March 19 Order. *Id.* ¶ 16. Treasury discussed this dedicated mailbox in the status report filed April 26, 2004. *See* April 26, 2004 Status Report, Attachment 1 to Deiner Decl. at 4. In the remote event that an FMS employee had a potentially discoverable (and non-privileged) electronic document on his or her PC hard drive, that document should also have been copied to FMS's dedicated mailbox. Gregg Decl. ¶ 16. This dedicated mailbox (along with the rest of FMS's email system) resides on a network drive, not on any PC's hard drive. *Id.* Because FMS's dedicated mailbox preserves tribal trust-related information that might also exist on a PC hard drive, FMS has not retained PC hard drives for this litigation. *Id.*

BPD does not perform any trust functions for funds that can be specifically identified as belonging to the Jicarilla Apache Nation. Meister Decl. ¶ 2. BPD does invest undifferentiated tribal funds that may include plaintiff's money, redeems those investments, and performs accounting functions relating to them. *Id.* The official electronic records for these investments, redemptions, and accounting activities are kept on the network, not PC hard drives. Meister Decl. ¶ 8. The network is protected by the backup and archive processes described above. BPD does not anticipate that any information reasonably subject to discovery can be found on its PC hard drives, unless the information has been copied from the network. Accordingly, BPD has not made a special effort to retain PC hard drives. Meister Decl. ¶ 8. When this equipment becomes antiquated or otherwise unsuitable for use, BPD replaces it. *Id.*

Finally, DO uses "DO LAN" work stations that are configured to save data files to the customer's "home" or shared data directories, which reside on the "DO LAN." Schultz Decl. ¶ 7. All

data servers for this local area network containing customer "home" or shared data are backed up onto the storage area network and backup tapes. *Id.* Accordingly, DO, like FMS and BPD, is not retaining PC hard drives for purposes of this litigation. *Id.*

## C. NATIONAL ARCHIVES AND RECORDS ADMINISTRATION (NARA) AND THE INDIAN TRUST ACCOUNTING DIVISION (ITAD) OF THE GENERAL SERVICES ADMINISTRATION

Neither NARA nor ITAD have on-going trust management responsibilities with respect to Jicarilla trust funds or assets. At most, they have functioned as repositories for historical documents that may be responsive to the subject matter of the Jicarilla litigation and the RROs.

NARA has two broad categories of documents: 1) historical documents from governmental agencies kept in Federal Records Centers (FRCs) and archives, and 2) NARA's own operational records. Declaration of L. Reynolds Cahoon, Assistant Archivist for Human Resources and Information Services, NARA, December 29, 2004 (Cahoon Decl.) ¶¶ 7-8, 14 (Attached as Exhibit 12). NARA has physical custody of agency records stored at FRCs, but legal custody remains in the agency that transferred the records to NARA. *Id.* ¶ 8. Pursuant to agency record retention schedules, records may be transferred to the legal custody of NARA. Such archival records are permanently retained at archive facilities. *Id.* Most of the archival records (primarily originating from Interior) relevant to the Jicarilla case are in hard-copy format. *Id.* ¶ 12. NARA staff have identified only four archival series of records (each relating to agencies other than Interior) in its custody maintained in electronic format that could conceivably be relevant to the cases. *Id.* In addition to the historical documents, NARA creates and maintains its own daily operational records, which are frequently in electronic form. NARA does not expect that any non-privileged information relevant to the litigation would be located in such records, nor in NARA's computer and network activity logs or web pages. *Id.* ¶ ¶ 14, 17, 19, 22-23. NARA

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JICARILLA APACHE NATION, f.k.a. JICARILLA APACHE TRIBE, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No. 02-25 L Judge Francis M. Allegra |

**DECLARATION OF RICHARD L. GREGG**

I, Richard L. Gregg, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am currently employed by the United States Department of the Treasury, Financial Management Service (FMS), as Commissioner. The mission of FMS is to provide central payment services to federal program agencies, operate the federal government's collections and deposit systems, provide government-wide accounting and reporting services, and manage the collection of delinquent debt. I have been employed by Treasury for 35 years and have been in my current position since February 1998. As Commissioner, I have responsibilities for the overall operations of FMS. In addition, I have been extensively involved in the Individual Indian Money (IIM) and Tribal trust litigation as it has affected FMS. The matters set forth below are true to the best of my knowledge, or are based on information I have received from FMS employees.

2. FMS acts as the federal government's money manager, providing centralized payment, collection, and reporting services for federal government agencies. FMS also oversees the federal government's central accounting and reporting system, keeping track of the federal

government's monetary assets and liabilities. Other than payments FMS may make at the direction of the program agency (by check or electronically), and certain deposits made by electronic funds transfers (EFTs) at the direction of the program agency, none of FMS' organizational responsibilities are known to generate documents tied directly to any tribe, including the Jicarilla and Laguna tribes. Instead, due to the nature of its mission and organizational responsibilities, the data maintained by FMS is, for the most part, unsegregated (*i.e.*, information related to one agency is not stored separately from data for any other agency) and summary level (*i.e.*, identifiable to the Department of the Interior but not to a particular tribe, or reflecting aggregate transactions as opposed to individual transactions).[1]

3. FMS records its activities on electronic media, but, except for payments made to the Jicarilla Apache Nation by or at the direction of the Department of the Interior and certain deposits made by electronic funds transfers at the direction of Interior, these electronic records cannot show what funds, if any, belong to the Jicarilla Apache Nation.

4. FMS also records certain activities of other federal agencies on electronic media, including information reported by Interior about the checks it has issued, including checks issued to tribes. Since April 2000, FMS has been recording on electronic media payee names and other information obtained from negotiated Treasury checks issued by Interior's Office of Trust Fund Management (OTFM) in an electronic system that FMS established as a result of the *Cobell* litigation, enabling those checks to be searched by payee name. Prior to that date, none of FMS's electronic systems could be searched by payee name to locate an OTFM-issued check.

1. The only exception, besides payments and certain deposits made by electronic funds transfers, would be **paper** records pertaining to the individual tribal accounts that existed prior to 1974, predating the electronic systems that generate the data discussed herein.

5. FMS is currently retaining indefinitely electronic data that records the funding, disbursement, and accounting activities described in the April 2004 status report, either in a system's storage device or in archival storage media. This data resides primarily within those FMS systems that perform centralized payment (disbursements such as payments to Social Security recipients), collection (handling of receipts sent to the Government, such as income tax collections), and accounting and reporting services for the Federal Government. In particular, the FMS systems with data potentially discoverable in this action are:

A. the Check Payment & Reconciliation (CP&R) system (and the report management system used with it, CA-BUNDL), a centralized computer system that is the repository for information about all the checks issued by the Federal Government since the system was established;

B. STAR, a system of central summary accounts that together comprise a consolidated record of the Government's cash financial operations. STAR aggregates all federal government receipt and disbursement transactions;

C. the Payments and Claims Enhanced Reconciliation (PACER ON-LINE) system, an integrated series of systems/processes that maintains information about electronic and check payments issued by FMS, including check payment status and claims activity. Its predecessor, PODSARS, performed similar functions;

D. the Treasury Receivable Accounting & Collection System (TRACS) (that also uses CA-BUNDL[2] as a report management tool), a debt recovery and accounting

2. CA-BUNDL is an online report management software system utilized in conjunction with CP&R and TRACS. It allows the online viewing of reports and enables retention of electronic versions of reports, which saves paper and eliminates the need to print and store bulky paper reports. Using CA-BUNDL, critical reports can be

system that performs all accounting, financial reporting, debt billing and collection activities related to the re-crediting of funds associated with Treasury check claims and cancellations.[3]; and

E. the OTFM Activity Tracking System (OATS), a system developed in 2000 as a result of the *Cobell* litigation that records information related to disbursements made under OTFM's disbursing officer symbol "4844" – specifically, check issuance information from OTFM, check negotiation information for checks issued by OTFM from the Philadelphia Federal Reserve Bank's "OTFM Data Entry System" (discussed in paragraph 9.B., *infra*), and information about electronic payments made by FMS at OTFM's direction.

6. These systems are designed to run on mid-tier or mainframe systems; desktop computers can be used only as an access point or gateway to these systems. The electronic data for these systems is stored on a Direct Access Storage Device (DASD), which is similar in function to a PC hard drive. The data on the DASD is cumulative, encompassing all current and historical data for the current systems. FMS routinely upgrades or replaces the DASD, but ensures that the data is preserved by moving a complete copy of that data to the new storage device.

7. If relevant data needed to be removed from the DASD for archival storage, FMS would follow a plan that ensures the data's retention in another media.

---

viewed on-line, archived and retained electronically. The archived reports can be recalled later as needed.

3. For example, if a check is lost, stolen, or wrongfully negotiated, the payee submits a claim and, if approved, a replacement check is issued. Meanwhile, TRACS records and accounts for FMS's collection or recovery of the proceeds of the initial check. TRACS is also the system used to transfer funds back to the agency when a check is cancelled.

8. Three other FMS systems might also contain information potentially discoverable in this action. They are *a)* the Limited Payability Report File, containing information about check claims investigations, *b)* a series of electronic databases created as a result of the *Cobell* litigation from paper documents of uncashed checks, and *c)* Lotus Notes, FMS's email application. The first two systems would have information related to tribal trust funds only by happenstance, if a tribe was recorded as the payee on a check claim under investigation or on a check that went uncashed. The data from these files are being retained indefinitely. With regard to Lotus Notes, as discussed in Treasury's original status report, FMS has established a dedicated mailbox for Jicarilla- and Laguna-related email and electronic documents and has instructed its employees to forward copies of all Jicarilla- and Laguna-related email and electronic documents to that mailbox.

9. Two systems used by FMS that might have data potentially discoverable in this action are maintained by third-parties on behalf of FMS. They are:

A. CA$HLINK II, a cash concentration and information system used to manage the receipt of funds collected by the Federal Government, maintained for FMS by Riggs Bank and the Richmond Federal Reserve Bank (FRB), and

B. ODES (OTFM Data Entry System), a system for recording information obtained from checks issued by OTFM as those checks are negotiated and paid through the Federal Reserve system, maintained for FMS by the Federal Reserve Bank (FRB) in Philadelphia.

10. As with the systems FMS manages itself, if relevant data must be removed from these systems for archival storage, FMS would require the third parties to follow a plan that ensures the data's retention in another media. For example, data from CA$H-LINK, the predecessor system to CA$HLINK II, was archived onto DVDs that are being retained by FMS.

11. FMS protects its systems and applications from catastrophic loss through the creation of business continuity (also known as disaster recovery) backup tapes. Business continuity tapes are designed to permit the wholesale restoration of data to a system in the event of a disaster; such tapes are not designed to be used (or allow access to the data on them) independent of the system that they back up. In other words, the contents of the tapes are generally intelligible and useful only to and in connection with the system being backed up; they are not necessarily intelligible or useful independent of that system. FMS creates new backup tapes at regular intervals and re-uses these tapes. A full set of backups captures all relevant data from previous backup tapes as well as any new data accumulated in the operating system or application being backed up.

12. FMS also requires its third-party system managers to protect the systems operated for FMS through the creation of backup tapes at regular intervals.

13. In the context of FMS's systems and applications used to perform payment, collection, and accounting and reporting services, "metadata" refers to data that are attached to and travel with other electronic data automatically, so that data can be identified, located, linked, or made accessible. FMS is preserving metadata to the same extent that it is preserving any

electronic data that evidences FMS's payment, collection, and accounting and reporting activities involving tribal trust funds.

14. In the context of FMS's systems and applications used to perform payment, collection, and accounting and reporting activities, "computer and network activity logs" are general system logs (*e.g.*, log-in data: who logged on, for how long, etc.) and are not considered data files. FMS is not taking any measures beyond its usual backup procedures to preserve computer and network activity logs for purposes of this litigation.

15. FMS's web site is hosted by the Bureau of the Public Debt, and can be found at http://www.fms.treas.gov. The information on the pages at this web site is static, not dynamic (*i.e.*, it consists of straight text or links to text). FMS receives a monthly backup CD of its website from BPD that is retained indefinitely. Additionally, FMS itself makes interim copies of its website and retains those copies for as long as they are needed (after which time they are written over).

16. FMS records its payment, collection, and accounting and reporting activities involving tribal trust funds in the systems set forth in Paragraphs 5 and 9, *supra*, not on employees' desktop personal computers (PCs). FMS employees may access office automation systems through their desktop PCs, and the electronic documents created using those systems (such as e-mail, word processing documents, or spreadsheets) may be saved to either the PC's hard drive or a network drive. In the remote event that an FMS employee had a potentially discoverable electronic document on his or her PC hard drive, that document should also have been copied to FMS's dedicated mailbox (discussed in the status report filed April 26, 2004).

FMS's dedicated mailbox, along with the rest of FMS's email system, resides on a network drive, not on any PC hard drive. Accordingly, FMS is not retaining PC hard drives for this litigation. When a PC hard drive becomes antiquated or otherwise unsuitable for use, FMS replaces it.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 4TH day of March, 2005.

RICHARD L. GREGG

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE JICARILLA APACHE NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-25L |
| | ) | Judge Francis M. Allegra |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF ANNE M. MEISTER**

I, Anne M. Meister declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am currently employed by the Department of the Treasury, Bureau of the Public Debt (BPD), as Deputy Commissioner. The mission of BPD is to borrow the money needed to operate the Federal Government and to account for the resulting debt. I have been employed by BPD for more than 30 years and have been in my current position since March 1999. As Deputy Commissioner, I have responsibilities for the overall operations of BPD. In addition, I have been extensively involved in the Tribal Trust litigation, as it has affected BPD. The matters set forth below are true to the best of my knowledge, or are based on information I have received from BPD employees.

2. BPD currently performs various activities for tribal trust funds, but none of these activities are for funds that can be specifically identified as belonging to the Jicarilla Apache Nation. In particular, BPD invests undifferentiated tribal funds and redeems these investments at the direction of the Interior Department. We record these activities on electronic media in the same systems used for all other funds, but these electronic records cannot show what funds, if any, belong to the Jicarilla Apache Nation.

3. BPD is currently retaining indefinitely electronic data that records the investment and redemption activities described in our April 2004 status report, either in a system's storage device or in archival storage media. In particular, these systems run the PARS, InvestOne, and FedInvest applications. If relevant data must be removed from these systems for archival storage, BPD follows a plan that ensures the data's retention in another media.

4. BPD protects these systems from catastrophic loss through the creation of backup tapes. These tapes are not designed to directly access any particular piece of data on the tapes, but rather to restore data to the relevant application should the need arise. BPD creates new backup tapes at regular intervals and re-uses these tapes. Full backups capture all relevant data from previous backup tapes as well as any new data accumulated in the system since the last backup.

5. In the context of our systems and applications used to perform investments and redemptions of trust funds, "metadata" refers to data that are attached to and travel with other electronic data automatically, so that transaction data can be identified, located, linked, or made accessible. BPD is preserving metadata to the same extent that it is preserving any electronic data that evidences the investments and redemptions made for tribal trusts.

6. In the context of our systems and applications used to perform investments and redemptions of trust funds, "computer and network logs" are general system logs that contain such information as the time and date that individual users logged into system computers, data related to the use of certain applications, and data related to security incidents. BPD is not taking any special measures to preserve computer and network

activity logs for purposes of this litigation. To the best of my knowledge, plaintiffs have not raised any issue in this case that would implicate BPD's logs.

7. BPD's web site can be found at http://www.publicdebt.treas.gov/. While some pages on this site are static, others draw dynamically upon data from relevant applications to provide information to the public. As an example, BPD uses an application to post the daily rates for state and local government securities at https://wwws.publicdebt.treas.gov/SZ/SPESDailyRate?requestType=R. BPD retains a copy of every static HTML web page, but not copies of dynamic web pages. Instead, BPD retains the underlying data used to create those dynamic web pages.

8. BPD keeps official records of its investments, redemptions, and accounting activities for tribal trust funds on the computer network, not on employees' personal computers. Accordingly, BPD has not made a special effort to retain PC hard drives for this litigation. When a PC hard drive becomes antiquated or otherwise unsuitable for use, BPD replaces it.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 17, 2005.

Anne M. Meister

Anne M. Meister

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JICARILLA APACHE NATION, f.k.a. JICARILLA APACHE TRIBE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-25 L<br>Judge Francis M. Allegra |
| UNITED STATES OF AMERICA, | ) | |
| Defendants. | ) | |

**DECLARATION OF RORY D. SCHULTZ**

I, Rory D. Schultz, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I currently am employed by the Department of the Treasury, Departmental Offices (DO), as Director (Acting) for Headquarters Information Technology in the office of the Chief Information Officer. (The term Departmental Office refers to the Office of the Secretary and the offices of other senior Treasury policy officials and support offices physically located in the Main Treasury building, the Annex and nine other satellite locations within the Washington, D.C. metropolitan area.) I have been employed at Treasury for 19 years as a federal employee. Since Summer 2000, I have been responsible for the Departmental Offices IT Infrastructure and Operations Team which maintains and supports the Departmental Office Local Area Network (DO LAN). The DO LAN houses the DO email system (Microsoft Exchange), customer data directories and various software applications and associated data files. I have been extensively involved in the Cobell litigation as it pertains to DO, specifically in the area of record retention. I have personal knowledge of the record retention requirements, instructions and practices implemented by Departmental Offices. The matters and facts set forth below are true to the best of my information, knowledge and belief, or relate to matters of which I have been informed by

Tab B-3
**EXHIBIT 11**

Departmental Offices federal or contractor personnel.

2. Departmental Offices are primarily responsible for policy formulation and overall management of the Treasury Department, and do not engage in operational activity. To the extent Departmental Offices has any electronic data likely to be subject to discovery in this action, that data would be found in certain systems that Departmental Offices uses for activities central to its mission. Those systems reside on the DO LAN and, in addition to Departmental Offices' email system, consist of shared and "home" LAN drives where users may store the relevant data.

3. Departmental Offices protects its LAN from catastrophic loss through the creation of backup tapes. The Department has been utilizing a tape backup system since the inception of the DO LAN in 1991. Departmental Offices creates new backup tapes at regular intervals. Full backups capture all relevant data from previous backup tapes as well as any new data accumulated in the systems or applications being backed up. The primary backup system on the DO LAN is called a Storage Area Network. (SAN). It gives added flexibility in storing and retrieving large amounts of data and was implemented to ensure that all email and data records are retained and accessible. For disaster recovery purposes, a SAN to SAN connection has been established between the Main Treasury SAN and the disaster recovery SAN. At 6 hour intervals (four times daily), data is replicated from the DO LAN storage area network to the disaster recovery storage area network to ensure viability in the event of a disaster.

4. In relationship to the DO LAN, "metadata" refers to data that are attached to and travel with other electronic data automatically, so that data can be identified, located, linked, or made accessible. DO is preserving metadata to the same extent that it is preserving any electronic data

that may be subject to discovery in this action.

5. I understand that "computer and network activity logs" are general system logs (*e.g.*, log-in data: who logged on, for how long etc.) and are not considered data files. Departmental Offices is not taking any special measures to preserve computer and network activity logs for purposes of this litigation.

6. Departmental Offices web site can by found at http://www.treas.gov/offices/ and pages linked thereto. The web site is static and is housed within the DO LAN. Departmental Offices currently retains Web pages in conjunction with the backup methodology described in Paragraph 3 above.

7. The DO LAN workstations are configured to save data files to the customer's "home" or shared data directories, which reside on the DO LAN and are subject to the backup procedures discussed in Paragraph 3, *supra*.. Moreover, DO LAN Information Technology staff created a Microsoft Exchange email account called tribal@do.treas.gov for the purpose of collecting email messages relevant to this case. DO employees received instructions for forwarding email messages relevant to the litigation referenced above from their DO LAN email accounts to the tribal@do.treas.gov email account. Accordingly, Departmental Offices has not made a special effort to retain any hard drives in conjunction with this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28 day of February, 2005.

Rory D. Schultz

# TAB C

**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C.**

GENERAL COUNSEL

March 29, 2002

**MEMORANDUM FOR** **THE CHIEF OF STAFF**
**THE EXECUTIVE SECRETARY**
**UNDER SECRETARY FISHER**
**ASSISTANT SECRETARY CLARIDA**
**ASSISTANT SECRETARY DUNCAN**
**ASSISTANT SECRETARY HAMMOND**
**ASSISTANT SECRETARY WEINBERGER**
**ASSISTANT GENERAL COUNSELS**
**COUNSELOR TO THE GENERAL COUNSEL**

**FROM:** David D. Aufhauser
General Counsel

**SUBJECT:** *Identification and Retention of Tribal Trust Fund Records*

Numerous Indian tribes have filed lawsuits against the Government relating to its administration and management of tribal trust funds and property. To date, 18 lawsuits have been filed, 17 since the beginning of January 2002. The number could, however, reach as many as 274.

The cases assert that the government has failed to provide the "Tribe with an accounting of the Tribe's trust funds." The complaints assert that "the Secretary of the Treasury of the United States is custodian of tribal trust funds, and has responsibility with regard to the administration of such funds and the preparation and maintenance of records in connection with those funds." The allegation is similar to what was alleged in Cobell.[1]

---

[1]The wave of tribal trust fund cases that have recently been filed are outside the scope of the claims brought by the individual Indian trust beneficiaries in Cobell v. Norton, which is currently being litigated in the Federal District Court here in Washington, D.C.. District and Appellate court decisions in Cobell confirm the Government's fiduciary obligations to Indian trust beneficiaries, and in particular, the duty to account. See, Cobell v. Babbitt, 91 F.Supp.2d 1 (D.D.C. 1999), aff'd sub nom Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001).

Prior to 1973, Treasury maintained in the central accounting system separate accounts for the tribal activity. In 1973, with the concurrence of GAO[2], these separate accounts (totaling approximately 1,500 at that time) were consolidated. We request your assistance in identifying what, if any, records[3] and groups of records may exist concerning the separate accounts held by Treasury prior to 1973, as well as the accounts that exist post 1973. Please provide your preliminary findings, including the location of these records, by April 12, 2002.[4]

Also, I ask that you take steps to retain and maintain those records associated with the tribal trust fund accounts, regardless of NARA approved disposition schedules. Please distribute this memorandum to the offices for which you are responsible. Please also take steps to ensure these records are retained and maintained. If you have any questions, please do not hesitate to contact Brian Ferrell of my office at (202) 622-8236.

---

[2]Treasury sought GAO concurrence with the consolidation based upon concerns with the historical commingling of tribal funds with "Indian Money, Proceeds of Labor" allowed for by a 1930's statute. GAO provided such concurrence on October 18, 1973. On November 26, 1973, Treasury adopted the consolidation of accounts effective July 1, 1973 by Treasury Directive No. 12499.

[3]The term "record" includes any handwritten, typed, or printed documents (such as memoranda, correspondence, telephone logs, calendars, notes, books, brochures, studies; writings, drafts, transcripts, and minutes). The term "record" also includes documentary material in other forms (such as electronic documents or presentations, electronic mail, magnetic tapes, computer disks, audio or video recordings, slides, microfilm, and motion pictures.

[4]The first of the government's responsive pleadings in these matters is due on April 26, 2002.

# TAB D

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

GENERAL COUNSEL

AUG 6 2007

**MEMORANDUM TO ALL DEPARTMENTAL OFFICES EMPLOYEES**

**FROM:** **ROBERT F. HOYT**

**SUBJECT:** Obligation to Retain Materials for Indian Litigation

The Department of the Treasury remains involved in numerous lawsuits filed by Native American individuals and tribes alleging that the U.S. Government owes an accounting for their trust funds or has mismanaged their trust funds and property. To ensure compliance with court retention orders and other litigation responsibilities, **Departmental Offices employees must retain all materials -- whether in paper, electronic (including e-mail or voice-mail), or tangible form -- that meet any of the criteria described below.** These criteria are broader than legally required and are designed only for Departmental Offices materials.

1. Materials that mention or relate to Individual Indian Money or Individual Indian Money accounts.

2. Materials that mention or relate to tribal funds or tribal fund accounts. For example, material relating to the depositing, investing, disbursing, or accounting of tribal funds must be retained.

3. Materials that mention or relate to any delay between the issuance of government checks and the redemption of investments in government accounts to cover those checks -- sometimes called "check float." This criterion is not limited to Indian or tribal trust funds.

Attached are instructions for retaining e-mails and voice-mails by forwarding them to dedicated mailboxes.

You are required to retain these materials until further notice from this Office. If you have questions regarding the retention of particular materials, please contact Peter Bieger, Deputy Assistant General Counsel (Banking and Finance) at (202) 622-1975. The retention orders from *Cobell v. Kempthorne* and the tribal trust lawsuits are located on Treasury's intranet at *http://home.do.treas.gov/litigations* and are incorporated herein by reference. This memorandum takes the place of earlier instructions issued in connection with the *Cobell* and tribal trust lawsuits. Thank you for your continued attention to this important matter.

Attachment: Instructions for using the dedicated Cobell and tribal mailboxes for retaining e-mails and voice mails.

**Attachment**

**Instructions for using the dedicated Cobell and tribal mailboxes for retaining e-mails and voice-mails**

*Cobell* materials retention procedures

To retain e-mails:

1. Send a "cc" (not a "bcc") of all e-mails (including attachments) that you initiate, that relate in any way to Individual Indian Money or Individual Indian Money accounts, to the dedicated e-mailbox at the following mailbox address: *cobell@do.treas.gov* or just *Cobell*.

2. Forward any e-mail that you receive, or have previously received and not already forwarded, (including attachments and retaining forwarding history) that relate in any way to Individual Indian Money or Individual Indian Money accounts, to the dedicated e-mailbox at the following mailbox address: *cobell@do.treas.gov* or just *Cobell*, unless you can tell from the message that the e-mail has already been sent to the dedicated e-mailbox.

Tribal trust materials retention procedures

To retain e-mails:

1. Send a "cc" (not a "bcc") of all e-mails (including attachments) that you initiate, that relate in any way to (a) tribal funds or tribal fund accounts or (b) any check float afforded to any invested government account, to the dedicated e-mailbox at the following mailbox address: *tribal@do.treas.gov* or just *tribal*. Please ensure that the tribe's name, if any, is included in the subject heading.

2. Forward any e-mail that you receive, or have previously received and not already forwarded, (including attachments and retaining forwarding history) that relate in any way to (a) tribal funds or tribal fund accounts or (b) any check float afforded to any invested government account, to the dedicated e-mailbox at the following mailbox address: *tribal@do.treas.gov* or just *tribal*, unless you can tell from the message that the e-mail has already been sent to the dedicated e-mailbox.

To retain voice-mails:

Forward all applicable voice messages that relate in any way to (a) tribal funds or tribal fund accounts or (b) any check float afforded to any invested government account, to the dedicated voice-mailbox in accordance with the following instructions:

- press 1 after (or while listening to) a new or saved message;
- press 2 to forward with comment;
- voice a comment and identify the relevant tribe, if any (e.g., "Message for tribal mailbox-Jicarilla Tribe"), then press #;
- enter extension 91313, then press #;
- press #, then press # again to send (forward).

At the request of the Department of Justice, please review the header of each voice message being forwarded and, when voicing a comment include the identity of the caller, the time and date of the message, the duration of the message, and the extension of the caller.

Please note that the *Cobell* and tribal e-mailboxes have been copied on the e-mail message conveying this memorandum.

# TAB E

# Official FMS Business

| | |
|---|---|
| **To:** | Office of the Commissioner Debt Management Services Federal Finance Financial Operations Governmentwide Accounting Information Resources AC Management Regional Operations HQ Austir Birmingham Kansas City Philadelphia San Francisco |
| **Date:** | 08/30/2007 |
| **From:** | William Higgins |
| **Subject:** | Cobell and Tribal Trust Litigation – FMS Retention Requirements |

Date: August 27, 2007

To: All FMS Employees

From: Kenneth R. Papaj
Commissioner

Subject: Cobell and Tribal Trust Litigation – FMS Retention Requirements

All FMS employees are again reminded that FMS remains subject to continuing court orders and Treasury directives, requiring us to retain and safeguard all documents, data and tangible things that relate to Individual Indian Money (IIM) and Tribal trust funds and assets, indefinitely.

Due to the large number of new tribal lawsuits that were filed in December 2006, new retention orders are now being entered in additional tribal cases (i.e., in addition to the orders entered in the Jicarilla and Laguna cases). As a result, ***this reminder includes one important change: the instruction to preserve voicemail messages now applies to all tribal-related voicemail messages, not just to Jicarilla- and Laguna-related voicemails.***

To ensure that we remain in compliance with all court orders and directives, please continue to adhere to the following FMS requirements:

Do not destroy any documents, data or tangible things unless you have received written approval from the Chief Counsel. This rule applies to all documents, data and tangible things, whether litigation-related or not. Prepare a disposition request, following the instructions contained in the Chief Counsel's March 7, 2000 memorandum entitled "Process for Obtaining Disposition Approval" (posted on the FMS intranet on the "Cobell/Tribal Litigation" page). The only exception to this rule is for "obvious non-record materials," as described in the attached "Quick Reference Guide."

Tab E

Continue copying or forwarding all Cobell-related and Tribal-related e-mail and other electronic documents to their respective dedicated mailboxes ("Cobell Archive@fms" for IIM-related e-mail/electronic documents and "Tribal Mailbox@fms" for Tribal-related e-mail/electronic documents). To insert a mailbox address on an e-mail, simply type "Cobell" or "Tribal" and press the "Enter" key. You may delete your copy of any e-mail or other electronic document sent to these mailboxes.

Promptly forward any voicemail messages that relate to ***any tribe*** to FMS' dedicated "Tribal" voicemail repository. Following are step-by-step instructions for forwarding voicemail messages to the repository:

Press "1" after (or while listening to) a new or saved message;

Then press "2" to forward with comment;

Voice a comment to include (1) the tribe's name when applicable, e.g., "Message for Tribal mailbox-Crow tribe," (2) the identity of the caller, (3) the time and date of the message, (4) the duration of the message, and (5) the caller's extension, and press #;

Enter extension 91313, and press #;

After the prompts, press #, and then press # again to send (forward).

Do not archive (move) data from any FMS electronic production systems that contain litigation-related data, except pursuant to a written archive plan that has been approved by the Commissioner's Office. Please refer to the Deputy Commissioner's March 24, 2000 memorandum entitled "Maintenance of Data on FMS Systems" (posted on the FMS intranet on the "Cobell/Tribal Litigation" page) for more information about this requirement.

Do not attempt to give guidance on record retention matters to Federal Reserve Bank personnel. Please refer all such questions to Terri Dawson at (202) 874-6877 or to Beth Kramer at (202) 874-7036.

I appreciate your continued compliance with these instructions and encourage you to review the pertinent memoranda posted on the FMS intranet. To locate the memoranda, double click on the icon for Internet Explorer. This moves you to FMS' intranet. Under "News" or "Hot Topics," click on "Cobell/Tribal Litigation."

If you have questions or need assistance regarding any of these retention requirements, please do not hesitate to contact Terri Dawson at (202) 874-6877 or Beth Kramer at (202) 874-7036.

Thank you.

Attachment

# "A Quick Reference Guide"

**REMEMBER: PRESERVE ALL INTERIOR/INDIAN-TRUST-RELATED MATERIAL!!**

## OBVIOUS NONRECORD MATERIALS

These may be destroyed without the approval of the Chief Counsel

| Categories | Examples |
|---|---|
| **1. Non-Treasury/FMS Material** | Office supply catalogs<br>vendor marketing materials<br>non-FMS publications/manuals, such as phone books, Federal Register, dictionaries, "Lotus Notes for Dummies," etc. |
| **2. Treasury/FMS Distribution/ Reference Material** | attendee's copy of handouts received at meetings, training, etc.<br>employee's copy of work-related organization charts, phone lists, Treasury Correspondence Manual, etc.<br>employee's copy of FMS publications, such as "Fiscal Scene"<br>excess stocks of FMS marketing materials, such as Direct Deposit brochures<br>notices received re: IT security, scheduling of meetings & van rides, training, "acting" managers, voting leave, etc. |
| **3. Personal Papers** | notices received re: retirements, deaths, TSP, CFC, PTI, Flex Account, etc.<br>employee's copy of T&A, payroll, personnel, etc. records ( except travel records/receipts)<br>printouts of non-Federal Web pages that were not used for FMS business<br>non-FMS-related calendars/reminders<br>recipes, poems, cartoons, etc. |
| **4. Other** | printer banner pages and printer failure reports<br>interim drafts created but never circulated to anyone<br>duplicates of any of the examples in these four categories. |

**Click here for more information on Cobell Litigation**

# TAB F

**Nancy Fleetwood/BPD**
08/29/2007 12:09 PM

To All - BPD (Business use only!)
cc Tribal Mail@BPD
bcc
Subject Retention notice

The Department of the Treasury remains involved in numerous lawsuits filed by Indian tribes alleging that the U.S. Government owes an accounting for their trust funds or has mismanaged their trust funds and property. To ensure compliance with court retention orders and other litigation responsibilities, Bureau employees must comply with the following requirements.

Until further notice, please retain **all documents, data, and tangible things**, including duplicates, e-mails, and voice mails, that relate to the following subjects:

- The receipt, investment, and disbursement of trust funds belonging to Indian tribes;
- Procedures for managing Indian tribal trust funds, including procedures relating to the payment of interest;
- Accounting for Indian tribal trust funds;
- Treasury's trust responsibilities towards Indian tribes, and litigation concerning these responsibilities;
- Management of Indian tribal assets, such as land, timber, oil, and mineral rights; and
- Document retention policies and practices pertaining to the subjects above.

Please interpret your obligations under this policy broadly. Where possible and consistent with your normal business practices, please segregate the material you are retaining from other documents and data. This will help us identify information pertaining to the litigation, as well as documents that can be safely destroyed at the end of the normal retention cycle. Attached are instructions for retaining e-mails and voice mails by forwarding them to dedicated mailboxes.

These instructions supplement the retention requirements for the *Cobell* litigation. You can find copies of the retention orders for the tribal litigation on the Chief Counsel's web page, available on BPD's intranet. If you need clarification or assistance, please contact BPD's Chief Counsel, Paul Wolfteich (x3705), or Brian Self (x3670) of his staff. Thank you for your continued cooperation and assistance with this policy.

Attachment: Instructions for using the dedicated tribal mailboxes to retain e-mails and voice mails.

## Attachment

### Instructions for Retaining E-Mails and Voice Mails For the Indian Tribal Litigation

To retain e-mails, you should forward them to this address: **Tribal Mail.** If the e-mails pertain to a particular tribe, please put the tribe's name in the subject heading.

To retain voice messages, please use the following procedure:

(1) Press 1 at the end of the message.

(2 Press 2 to forward the message with comments.

(3) Add your comments to the recording by saying the information in the message's header (e.g., the time and date of the message and the duration of the message). The voice mail system provides this information before each recorded message. If the message relates to a particular tribe, please mention that as well. Then press #.

(4) Enter extension 2000, then press #.

(5) Press # twice. When the message has been forwarded, you may delete it from your personal voice mailbox.

You may find it helpful to put this procedure by your phone. You may also wish to inform your colleagues that, because of the additional complications in retaining voice mail, you prefer to receive messages on Indian tribal matters by e-mail.

# TAB G

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
HYATTSVILLE, MD 20782

NOV 13 2007

Thomas E. Mills
Assistant Archivist for Regional Records Services
National Archives and Records Administration
Office of Regional Records Services
8601 Adelphi Road, Suite 3600
College Park, MD 20740-6001

Dear Mr. Mills:

At the direction of the U.S. Department of Justice, the Financial Management Service's (FMS's) Office of Chief Counsel has requested that we send you the four, enclosed records retention orders in the Kaw Nation of Oklahoma, the Pawnee Nation of Oklahoma, the Quechan Tribe of the Fort Yuma Indian Reservation, and the Round Valley Indian Tribes tribal cases. These new retention orders do not alter in any way previous court orders issued in the Cobell, et al. v. Kempthorne, et al. litigation. We ask that the Federal Records Centers continue to implement the freeze on **all** records from FMS Record Groups 039, 050, and 425 and preserve all such records until further notice, including records about the four tribes cited above.

The Office of Chief Counsel has also informed us that it is likely that records retention orders in other tribal cases are likely to be issued too. As soon as we learn of such court orders, we shall notify you of them.

If you have any questions, you may contact Charles Brett at (202) 874-6156. Thank you again for your cooperation in this matter.

Sincerely,

Sharon M. King, Director
Administrative Programs Division

Enclosures

cc: Margaret Marquette
Teresa Dawson

Tab G

# TAB H

DEPARTMENT OF THE TREASURY
BUREAU OF THE PUBLIC DEBT
PARKERSBURG, WV 26106-1328

August 21, 2007

National Archives and Records Administration
Life Cycle Management Division
Attention: Stephen Cooper
8601 Adelphi Road
College Park, MD 20740-6601

Re: Suspending Destruction

Dear Mr. Cooper:

As you are aware, the Bureau of the Public Debt (BPD), Department of the Treasury, has been under court order since August 1999 to preserve all documents relating to the pending litigation, Cobell v. Kempthorne, et al., which challenges the government's management of the Individual Indian Monies (IIM).

The purpose of this letter is to remind you that BPD remains under court order to preserve records indefinitely for purposes of the Cobell litigation. Therefore, we request that the Federal Records Centers continue to implement the freeze on **all** records from BPD Record Groups 53 and 82 and preserve all such records until further notice.

Thank you for your cooperation in this matter.

Sincerely,

Vicki S. Thorpe

Vicki Thorpe, Manager,
Graphics, Printing, and Records Branch
Records Officer

# TAB I

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227

November 5, 2007

**VIA FACSIMILE AND REGULAR U.S. MAIL**

Mary H. Karr
Senior Vice President
The Federal Reserve Bank of St. Louis
411 Locust Street
St. Louis, MO 63102

Re: Retention of Treasury Fiscal Agency Records in Compliance with the October 1, 2007 Order of the Court in Round Valley Indian Tribes v. USA, No. 06-900L (C.F.C.), the October 26 Order of the Court in Pawnee Nation v. USA, No. 07-002L (C.F.C.), the October 24, 2007 Order of the Court in Kaw Nation v. USA, No. 06-934L (C.F.C.), and the October 25, 2007 Order of the Court in Quechan Tribe v. USA, No. 06-888L (C.F.C.)

Dear Ms. Karr:

The purpose of this letter is to advise the Federal Reserve Bank (FRB), which serves as Treasury's fiscal agent, that Treasury has become subject to four new document retention orders in the above-referenced cases. Copies are attached for your convenience. These orders require the FRB to continue complying with all record retention instructions that Treasury has provided to the FRB in connection with the court Orders in the Cobell, et al. v. USA, Jicarilla Tribe v. USA, and Pueblo of Laguna v. USA cases, which have been the subject of prior communications from us. Those earlier Court Orders and all Treasury instructions to date remain effective and unchanged.

Treasury's "standing instructions" require that no Treasury fiscal agency records be destroyed without the prior written approval of Treasury's designated representative(s). The Chief Counsels of the Financial Management Service (FMS) and the Bureau of the Public Debt (BPD) are designated to provide you (FRB's designated representative) with written destruction approvals on behalf of their respective bureaus, for specific categories of fiscal agency records that Treasury determines are not "Cobell" or "Tribal" related.

Please continue to take all steps you deem appropriate to ensure that all Federal Reserve Banks and Branches continue to preserve pertinent Treasury fiscal agency records indefinitely. "Records" include "documents," "data" and "tangible things," in all forms

and media (e.g., paper, film, electronic), at all locations (including Federal Records Centers, private storage facilities and on-site facilities), and in any associated NARA "Record Groups" (including, but not necessarily limited to, Record Groups 425, 39, 50, 53 and 82).

Please also be advised that there are several other similar tribal cases in which the judges may enter document retention orders, so you may receive similar notices from us in the future.

Thank you for your cooperation. Please direct any inquiries to me at (202) 874-6681 and/or to Paul Wolfteich, Chief Counsel for BPD, at (202) 504-3705.

Sincerely,

Margaret Marquette

Margaret Marquette
Chief Counsel

Attachments

cc (w/out attachments): Paul Wolfteich, Chief Counsel, BPD

# TAB J

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227

November 7, 2007

Mr. Stephen C. Herndon
Senior Vice President of Bank of America
Federal Government Banking Division
600 Peachtree Street, NE
Atlanta, GA 30308-2214

Re: Bureau of Indian Affairs - Palm Springs Lockbox Account (closed 11/1/05)
Agency Location Code 00004844, Lockbox Number 72758

Dear Mr. Herndon:

This is to advise you that Treasury has become subject to four new document retention orders in Round Valley Indian Tribes v. USA, No. 06-900L (C.F.C.), Pawnee Nation of Oklahoma v. USA, No. 07-002L (C.F.C.), Kaw Nation of Oklahoma v. USA, No. 06-934L (C.F.C.), and Quechan Tribe of the Fort Yuma Indian Reservation v. USA, No. 06-888L (C.F.C.). Copies of these orders are attached. ***These new retention orders do not impose any new retention requirements on you, because our retention instructions for the Cobell case have been sufficiently broad to cover all Indian trust materials. In other words, the same retention instructions you have received from us for the Cobell case are adequate to meet the requirements of these four new tribal retention orders.*** The retention orders collectively require us to preserve, indefinitely, all records relating to Indian and tribal trust funds and trust assets. Notwithstanding the fact that the above-referenced lockbox account was closed effective November 1, 2005, please continue to retain all documentation pertaining to the account until further notice. You have confirmed that the account records include:

Standard Form 215
Standard Form 5515
Check copies
Monthly Account Activity Reports (MAAR)
Monthly Account Analysis Statements (MAAS)
Standard Listing
Any forms used to facilitate internal processing, such as the Daily Balance Sheet

Your bank must continue to retain the records for this account IN ALL FORMS AND MEDIA that were generated. Accordingly, notwithstanding that your bank began generating photocopies of the checks associated with this account on October 1, 2001,

you must continue retaining any duplicate copies on microfilm, unless and until FMS obtains court approval for your bank to retain only pre-October 2001 microfilm copies and post-September 2001 photocopies.

There are several other similar tribal cases pending in which the judges may enter document retention orders, so you may receive similar notices from us in the future.

Please distribute this letter to appropriate bank personnel, including records management personnel. If you have any questions regarding these retention instructions, please contact me at (202) 874-6847.

Thank you for your continued cooperation.

Sincerely,

Michael Mackay

Michael Mackay
Director, General Revenue Collection Division

cc: Linda S. Corbett, Senior Vice President, Bank of America

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227

November 7, 2007

Ms. Elaine Friedman
Vice President of Mellon Bank
Mellon Client Service Center
Suite 1260
Pittsburgh, PA 15259-0001

Re: Minerals Management Service Lockbox Account
Agency Location Code 14170001, Lockbox Number 911-4258

Dear Ms. Friedman:

This is to advise you that Treasury has become subject to four new document retention orders in Round Valley Indian Tribes v. USA, No. 06-900L (C.F.C.), Pawnee Nation of Oklahoma v. USA, No. 07-002L (C.F.C.), Kaw Nation of Oklahoma v. USA, No. 06-934L (C.F.C.), and Quechan Tribe of the Fort Yuma Indian Reservation v. USA, No. 06-888L (C.F.C.). Copies of these orders are attached. ***These new retention orders do not impose any new retention requirements on you, because our retention instructions for the Cobell case have been sufficiently broad to cover all Indian trust materials. In other words, the same retention instructions you have received from us for the Cobell case are adequate to meet the requirements of these four new tribal retention orders.*** The retention orders collectively require us to preserve, indefinitely, all records relating to tribal trust funds and trust assets. Accordingly, please continue to retain all documentation pertaining to the above-referenced lockbox account until further notice. You have confirmed that the records for this account include:

Standard Form 215
Standard Form 5515
ACH Receiving Remittance/Payment Report
Demand Deposit Account Activity Statements
Any forms used to facilitate internal processing, such as the CA$H-LINK II Deposit Report Form

You must retain the records for this account IN ALL FORMS AND MEDIA generated for the account. This includes paper, electronic, microfilm, microfiche, or any other media. If you create the same record in multiple media, you must retain the record in all media.

There are several other similar tribal cases pending in which the judges may enter document retention orders, so you may receive similar notices from us in the future.

Tab J

Please distribute this letter to appropriate bank personnel, including records management personnel. If you have any questions regarding these retention instructions, please contact me at (202) 874-6847. Thank you for your continued cooperation.

Sincerely,

Michael Mackay
Director, General Revenue Collection Division

# TAB K

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
HYATTSVILLE, MD 20782

NOV 7 2007

Michael Stenger
Assistant Director,
Office of Investigations
U.S. Secret Service
950 H Street, N.W.
Washington, D.C. 20223

Re: Document Retention Orders in Round Valley Indian Tribes v. USA, No. 06-900L (C.F.C.), Pawnee Nation v. USA, No. 07-002L (C.F.C.), Kaw Nation v. USA, No. 06-934L (C.F.C.), and Quechan Tribe v. USA, No. 06-888L (C.F.C.)

Dear Mr. Stenger:

This is to inform you that Treasury has become subject to four new document retention orders in the above-referenced lawsuits, requiring Treasury to retain, indefinitely, "every document, [datum/data] or tangible thing … containing information that is relevant to, or is reasonably calculated to lead to the discovery of admissible evidence relevant to, the subject matter involved in the pending litigation." As with the orders issued in the Jicarilla and Laguna cases in 2004, the definition of "document" includes voice mails and emails. Copies of the four new document retention orders are attached.

These four cases involve claims by Indian tribes against the government for alleged trust fund mismanagement. There are several other similar tribal cases in which the judges may enter document retention orders, so you may receive similar notices from us in the future.

***These new retention orders do not impose any new retention requirements on you, because our retention instructions for the Cobell case have been sufficiently broad to cover all Indian trust materials. In other words, the same retention instructions you have received from us for the Cobell case are adequate to meet the requirements of these four new tribal retention orders.*** As stated in previous reminder letters to Secret Service pertaining to the record retention order in Cobell, among the types of records that Treasury must preserve to comply with these court orders are all Treasury checks and check-related records. Accordingly, please continue to preserve, until further notice, all Treasury checks that FMS forwards to your bureau for investigation and all information and records your bureau maintains relating to those checks. Please continue to take all

Tab K

steps necessary to determine and document that all such records in the possession of Secret Service are being preserved indefinitely.

If you have any questions concerning these document retention orders, please contact Terri Dawson in the FMS Chief Counsel's office, at (202) 874-6877, or me, at (202) 874-7913.

Thank you for your continued cooperation and assistance.

Sincerely,

Ronald G. Cymbor, Director
Check Resolution Division

Enclosures

cc: Patrick Fitch, Office of Chief Counsel, U.S. Secret Service – Fax #202/406-6544
(ph. 406-5871)

# TAB L

Treasury is now subject to four new record retention orders in the Round Valley, Pawnee Nation, Kaw Nation and Quechan Tribe cases. These orders require you to continue retaining records according to FMS' prior instructions related to the Cobell case. ***These new retention orders do not impose any new retention requirements, because our instructions for the Cobell case have been sufficiently broad to cover all Indian trust materials.*** As stated in our July 9, 1999 letter concerning retention requirements in Cobell and in each reminder since, you must retain, until further notice:

> Standard Form 215, Standard Form 5515 and any supporting documentation, IN ALL FORMS AND MEDIA, associated with transactions relating to deposits received from the Department of the Interior for credit to the Treasury's General Account (TGA). This includes paper, electronic, microfilm, microfiche, or any other media.

Please ask your designated contact person to share these instructions with appropriate personnel at your organization (including records management personnel). Please also ensure that an appropriate distribution and compliance process is in place to ensure these instructions are being followed at your financial institution.

There are several other tribal cases in which record retention orders may be entered, so you may receive similar BAMs in the future.

If you have any questions, contact the Federal Reserve Bank of St. Louis at 1-866-771-1842 or Ava Singleton at (202) 874-9986.